## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNLIMITED TECHNOLOGY, INC. | : |
| | : CIVIL ACTION NO. |
| PLAINTIFF, | : |
| v. | : |
| | : JURY TRIAL DEMANDED |
| RICHARD LEIGHTON, a/k/a RICK LEIGHTON, | : |
| DTS SECURITY, INC., AND SECURE VIZUAL, LLC | : |
| | : |
| DEFENDANTS. | : |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

Plaintiff, Unlimited Technology, Inc. ("Plaintiff" or "UTI"), by and through its undersigned counsel, brings this action against its former employee, Richard Leighton, a/k/a Rick Leighton ("Leighton") and his companies, DTS Security, Inc. ("DTS") and Secure Vizual, LLC ("Secure Vizual") (collectively, "Defendants"). UTI seeks injunctive relief to stop Defendants from misappropriating and using UTI's confidential trade secrets and to enjoin Leighton from soliciting UTI's customers and employees in violation of his employment agreement. UTI also seek damages arising from Leighton's breach of contract and Defendants' tortious conduct, including violations of the Defend Trade Secrets Act, (DTSA), 18 U.S.C. § 1836, *et seq*.

### PARTIES

1.      UTI is a corporation organized and existing under the laws of Pennsylvania, with a registered corporate address and principal place of business located at 20 Senn Drive, Chester Springs, Pennsylvania 19425.

2.      Leighton is an adult individual who purports to reside at 2875 Crescent Parkway, Apt. 1501, Atlanta, Georgia 30339.

3.      DTS is a corporation organized and existing under the laws of Georgia, with a registered corporate address at 2451 Cumberland Pwky, Suite 3988, Atlanta, GA 30339.  Upon information and belief, DTS is owned entirely by Leighton.

4.      Secure Vizual is a limited liability company organized and existing under the laws of Georgia, with a registered company address at 2451 Cumberland Pwky, Suite 3988, Atlanta, GA 30339.  Upon information and belief, Leighton is the sole member of Secure Vizual and its sole owner.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to the DTSA and 28 U.S.C. § 1331, and supplemental jurisdiction over UTI's remaining claims pursuant to 28 U.S.C. § 1367. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, since the matter at issue exceeds the sum or value of $75,000, exclusive of interest and costs, and Defendants are residents of Georgia, which would make this an action between citizens of different states.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to UTI's claims occurred here, and a substantial part of property that is the subject of the action is situated here.

## FACTUAL BACKGROUND

### Overview of UTI

7.      UTI was formed in 1999 and operates as a custom design build security integrator, managed service provider and technology company.

8.      UTI offers expertise in the most advanced security equipment and has a large customer base throughout the United States, as well as internationally.

9.      Although UTI routinely works with traditional commercial businesses to meet their security needs, it has been called upon to provide security for a wide range of customers, including nuclear power plants, water fronts and chemical/gas applications.

## Leighton's Employment with UTI

10.      Leighton became employed by UTI on or around January 6, 2014, and his last day of employment with UTI was September 29, 2016.

11.      Leighton's job title with UTI was Vice President of Sales, and his job duties included overseeing the entire sales and marketing department of UTI.

12.      Leighton routinely worked out of UTI's office in Chester Springs, Pennsylvania.

## Leighton's Restrictive Covenants

13.      As a condition of employment, Leighton entered into and signed an Employment Agreement with UTI dated January 6, 2014 (the "Employment Agreement"), which included, *inter alia*, covenants not to solicit UTI's customers or employees, and not to divulge UTI's proprietary and confidential information, including its trade secrets.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit "A".

14.      The provision of the Employment Agreement related to non-solicitation provides as follows:

> Restrictive Covenant.
> Employee agrees that during the term of this Agreement and for a period of two (2) years after the date of termination, he shall not, directly or indirectly, individually or jointly, whether for his own benefit or as an employee, agent owner, partner, director, officer, shareholder, representative or otherwise, (i) contact, solicit, hire, approach or seek business from or with Company's then current customers or employees.

Employment Agreement, ¶ 6.

15.     The provision of the Employment Agreement related to proprietary and

confidential information provides as follows:

> Ownership of Materials, Good Will and Trade Secrets.
> Company shall be the absolute and unqualified owner of all records, customer and
> supplier lists and records, information, computer programs, ideas, patents,
> concepts, training methods and processes obtained or created by Employee or
> supplied to him while rendering services for Company.  Employee understands
> and agrees that he is at all times acting as an agent of Company and shall have no
> right, title or interest in or to such material.  Employee agrees and expressly
> acknowledges that all such information constitutes the trade secrets of Company
> and are the sole property of Company and may not be used or otherwise disclosed
> by Employee at any time, directly or indirectly, for any purpose other than that of
> rendering services to Company and shall be held confidential at all times.
> Employee understands that these trade secrets were developed during the course
> of Company's business, that they are extremely valuable to Company and critical
> to Company's financial operations and the continued success of Company's
> business operations.

*Id.*, ¶ 7.

16.     The Employment Agreement also contains Leighton's agreement to the injunctive

relief UTI seeks in this case.  It provides as follows:

> Enforcement.
> Employee hereby agrees that Company's remedy in the form of monetary
> damages from any actual or threated breach by Employee of its obligations,
> covenants, representations and warranties hereunder, and particularly those
> contained in Sections 6 and 7 hereof, will be inadequate, and that Company shall
> also be entitled to enforce any provision of this Agreement, and particularly those
> contained in Sections 6 and 7, by temporary or permanent injunction or other
> equitable relief obtained in any court of competent jurisdiction without the
> necessity of proving damages, posting bond or other security to prevent any
> breach or threatened breach by Employee hereunder.   Any such mandatory
> equitable relief shall be without prejudice to any other rights or remedies which
> may be available to Company at law or in equity.  Employee shall reimburse
> Company for attorney fees incurred by Company in enforcement of the provisions
> of this Agreement.

*Id.*, ¶ 8.

17.     The Employment Agreement provides that it shall be governed by and construed

in accordance with the laws of the Commonwealth of Pennsylvania.  *Id.*, ¶ 12.

18.     While not imposing undue hardships on Leighton, the foregoing restrictions protect UTI's legitimate interest in, *inter alia*, its proprietary and confidential information, including customer goodwill and trade secrets.

19.     As Vice President of Sales at UTI, Leighton had access to trade secrets and other proprietary and confidential information, including but not limited to: customer lists, customer contacts and customer information; customer goodwill; revenue, sales and other financial information; business strategies; marketing initiatives and sales and advertising strategies; pricing strategies; key information concerning product and service suppliers, including subcontractors; training methods, information and materials; and computer software and programming information (collectively, "UTI's Trade Secrets").

20.     Leighton held an important position within the company and was often involved in senior level communications with UTI's top executives relating to business, sales and marketing strategies where many of UTI's Trade Secrets were provided to him.

21.     In overseeing marketing and sales at UTI, Leighton had access to and did access various other types of UTI's Trade Secrets, including customer lists, contacts and information; and Leighton utilized and benefitted from the customer goodwill that UTI had developed over decades.

22.     Leighton was also continually informed and advised about a proprietary software UTI developed concerning a dashboard product ("UTI's Dashboard Product") from the early stages of its development through its completion.

## Defendants' Unlawful Acts

**Leighton Resigns And Flagrantly Breaches The Employment Agreement**

23.     On September 7, 2016, Leighton told UTI that he was resigning from the company and starting his own business.

24.     At or around this time, Leighton informed UTI that its largest customer, The Home Depot ("THD"), would no longer be doing business directly with UTI, and instead, would be working with Leighton's new company, DTS.

25.     Leighton told UTI that if it was interested in getting any of THD's future work, it would have to be as a subcontractor through DTS.

26.     Leighton understood that he was restricted from working with and/or soliciting THD due to the non-solicitation provision of his Employment Agreement, but he threatened UTI that if it attempted to enforce the Employment Agreement, he would ensure that UTI never received any future work involving THD.

27.     UTI had reason to believe that Leighton could enforce his threats, since as Vice President of Sales at UTI, Leighton had been the primary contact with THD for more than two-and-a-half years, and had worked directly with THD's Director of Corporate Security.

28.     After Leighton resigned, UTI was no longer able to bill THD directly, as it had always done in the past.  This was a direct result of Leighton's intentional interference with UTI's contractual relationship with THD and his breach of the Employment Agreement.

29.     UTI has been forced to accept the THD work that Leighton has made available to UTI through DTS out of financial necessity, and not because it agreed to or accepted Leighton and DTS's extortion-like tactics.

30.     UTI has also never waived any of its rights to enforce the Employment

Agreement.

31.     The Employment Agreement has a "no waiver" provision which states as follows:

No Waiver.
The failure of either party to insist upon strict performance of any obligation
hereunder shall not be a waiver of that party's right to demand strict compliance
with that or any other obligation hereunder in the future.   No waiver shall be
effective unless in writing signed by the parties.

Employment Agreement, ¶ 10.

**UTI Discovers Defendants' Secretive And Unlawful Acts**

32.     A recent internal investigation by UTI uncovered emails and other evidence that

shows Leighton committed various wrongful, disloyal and unlawful acts while employed by

UTI.

33.     While working for UTI and being paid to promote UTI's products and services,

Leighton surreptitiously acted to promote DTS and a competing knock-off dashboard product,

SecureVizual ("SV").

34.     For example, on May 25, 2016, Leighton solicited Sean Dessources, the

Corporate Asset Protection Manager at THD, and wrote the following to him in an email that has

the subject heading of "DTS":

Sean – I don't mean to flood your email with sales guy stuff but I wanted to
provide you with a link to our consulting company that does the dashboard.  Our
web address is www.dtsmetrics.com/about and below is a shot of SecureVizual in
the new SOC at the MTC.

*See* Leighton email, 5/25/16, attached hereto as Exhibit "B".

35.     This email was from Rick.Leighton@dtsmetrics.com, as opposed to Leighton's

UTI email address, even though it was sent four months *before* Leighton stopped working for

UTI.  *See id.*

36.     The SV product which Leighton pitched to THD, and which is currently marketed and sold by Defendants, was and still is a competing product to UTI's Dashboard Product.

37.     At the time this email was sent, Leighton was being paid to promote UTI's Dashboard Product to UTI's customers, and specifically to THD.

38.     UTI provided Leighton with confidential and proprietary information concerning UTI's Dashboard Product, all of which are part of UTI's Trade Secrets and were developed with substantial effort and expense by UTI, and Leighton was included in a small group of people at UTI who possessed such information.

39.     While employed by UTI, Leighton received, *inter alia*, confidential marketing materials, literature and white papers related to UTI's Dashboard Product, all of which were considered UTI's Trade Secrets and closely guarded by UTI.

40.     Unbeknownst to UTI, Defendants, by and through Leighton, secretly misappropriated UTI's Trade Secrets related to UTI's Dashboard Product, to create, develop and market SV.

41.     A review of the public information available about SV reveals that Defendants stole many of the features of UTI's Dashboard Product, as well as UTI's marketing and business strategy, all of which are UTI's Trade Secrets.  Upon information and belief, SV also contains or is based upon the technical aspects of UTI's Dashboard Product, including proprietary software development and coding.

42.     Significantly, while employed by UTI, Leighton would frequently report to UTI that its customers were not interested in *any type of dashboard product*, and that this was the reason he was unsuccessful in marketing and selling UTI's Dashboard Product.

43.     It is thus evident that while employed by UTI, Leighton was deliberately sabotaging UTI's efforts to promote UTI's Dashboard Product and disregarding UTI's instructions to him, so that he could promote SV (and Defendants), while secretly competing against UTI.

44.     In the May 25, 2016 email to THD, Leighton's email signature contains the title "DTS Consultant".  *See* Exhibit "B".

45.     In other emails that month from Leighton to Mr. Dessources of THD, Leighton promotes DTS and SV directly from his UTI email account.  *See* emails from 5/10/16 and 5/24/16, attached hereto as Exhibit "C".

46.     In one email, dated May 10, 2016, Leighton says the following:

Hey Sean – at some point maybe we can catch up **regarding the security dashboard service we sell, SecureVizual**.  Before Stefani went out she seemed pretty interested and **we do some great things for customers that use our solution** (including the corporate team here at the SSC).

**…I attached the proposal I had given Stefani, however we can start at a much lower price point if needed**.

*See* Exhibit "C" (emphasis added).

47.     In no uncertain terms, Leighton was pitching THD, UTI's largest customer, on a product that he claimed to be selling through DTS to *other customers*.  While engaged in this scandalous behavior, Leighton was acting as the Vice President of Sales and one of UTI's highest salaried employees.

48.     This was not just a clear violation of the Employment Agreement, but blatant interference with UTI's relationship with THD, and seemingly other "customers", who were being sold on SV, instead of, and at the expense of, UTI's Dashboard Product.

49.     UTI's investigation also uncovered that Defendants' interference was not limited to SV's competition with UTI's Dashboard Product, but included other products and services.

50.     For example, on May 9, 2016, while writing from his UTI account and in his capacity as a UTI employee, Leighton emailed Jim Lafferty, Senior Security Consultant at the Philadelphia Protection Bureau, and Ryan Mellow, Account Manager at Milestone Systems, for the specific purpose of promoting DTS and stated the following:

> Guys – keep me in mind if you run across any customers or prospects that want to view their team's or security system's performance against any metrics or KPI's. Check out the following link for a (very brief) idea of what I am doing www.dtsmetrics.com/about [.] I also have some consulting stuff going (all of this is on the side, but I have multiple customers using this and hoping to make a run at making it work – **but still working full time here at [UTI]  so keep it between trusted people right now** [.]

*See* email, 5/9/16, attached hereto as Exhibit "D" (emphasis added).

51.     At no time prior to Leighton's abrupt resignation did UTI authorize or approve of Leighton performing any outside work, particularly the type of security work performed by DTS and referenced in this email, which competes with UTI's products and services.

52.     While employed by UTI, it was expressly understood by Leighton and UTI that Leighton's work and duty of loyalty were exclusive to UTI.  Leighton was not permitted to compete by the express language of the Employment Agreement, nor did he ever receive a waiver to engage in the type of conduct referenced in his emails.

53.     It is also evident that Leighton understood his actions were disloyal and unlawful, as he expressly requested that Mr. Lafferty and Mr. Mellow keep his email a secret. *See id.*

54.     On some occasions, Leighton was brazen about his misconduct, even in front of other UTI employees.

55.     For example, in an email from May 31, 2016, with the subject heading of "Re: Quote for THD", Leighton gloats to Brian Glendon, a former co-worker at UTI who Leighton supervised, that he is going to steal work from THD and "book it through DTS and make a buck or two." *See* email, 5/31/16, attached hereto as Exhibit "E".

56.     On another occasion, shortly before he left UTI, Leighton solicits Charlie Von Stetten, Vice President of National Accounts at UTI, to come work with him at DTS.  In an email dated September 19, 2106, Leighton tells Mr. Von Stetten to "stick with DTS" and states that he has a "feeling that the war is just beginning." *See* email, 9/19/16, attached hereto as Exhibit "F".

57.     Upon information and belief, while still employed with UTI, Leighton solicited both Mr. Von Stetten and Lucia Capriotti, Vice President of Human Resources at UTI, to work for him at DTS and/or Secure Vizual.

58.     Upon information and belief, Leighton has also solicited and hired Sean Moody, a former UTI employee whose last day of employment with UTI was January 20, 2017.

59.     Mr. Moody was employed by UTI as a project manager and had been with the company since September of 2005.  It is believed that Mr. Moody has been working for Leighton and DTS and/or Secure Vizual since at least March 9, 2017, and that he uses an email address associated with DTS.

60.     At all times relevant hereto, Defendants understood that Moody has a restrictive covenant with UTI that prevents him from working for Defendants.

61.     Upon information and belief, prior to his resignation, Leighton copied various amounts of UTI's Trade Secrets, including customer lists and contact information; financial information for UTI and its customers; business, marketing, advertising and sales information;

pricing strategies; key information relating to products and service suppliers, including

subcontractors; training methods, information and materials; and computer software and

programming information.

### Defendants Initiate An Anticipatory Action In Georgia While Engaged In Settlement Negotiations With UTI, Demonstrating Their Inequitable Conduct, Bad Faith And Improper Forum Shopping

62.     On March 31, 2017, the undersigned counsel for UTI sent Defendants a letter

which reminded Leighton of his post-employment obligations, alerted Defendants about UTI's

recent discovery of their unlawful conduct, and requested that Defendants cease and desist from

engaging in such activities.  *See* Letter to Defendants, 3/31/17, without attachment, attached

hereto as Exhibit "G".

63.     In this letter, counsel for UTI requested that he be contacted by Defendants'

attorney by April 17th if Defendants were interested in avoiding litigation.  *See id.*

64.     On April 6, 2017, Charles A. Hawkins, Esquire, counsel for Defendants,

contacted UTI's counsel to engage in settlement communications and he requested, and it was

agreed, that suit would not be commenced while the parties were engaged in such discussions.

65.     Thereafter, on April 12, 2017, Mr. Hawkins contacted counsel for UTI by email

and requested to have another telephone discussion the following day.

66.      On April 13, 2017, Mr. Hawkins stated in a telephone call to UTI's counsel that

Leighton was organizing documents that he would be voluntarily disclosing for purposes of pre-

suit settlement negotiations, and that Mr. Hawkins intended on marking them as for settlement

purposes only.

67.     In this call, Mr. Hawkins also encouraged UTI's counsel to come up with a list of documents and information that UTI would need from Defendants for purposes of these settlement discussions.

68.     Accordingly, on April 13, 2017, and as a follow-up to Mr. Hawkins' call, UTI's counsel took considerable efforts to draft a list of discovery requests to Defendants that would aid the parties in their settlement talks.  These requests were then emailed to Mr. Hawkins.  *See* Email to Charles Hawkins, Esquire, 4/13/17, attached hereto as Exhibit "H".

69.     In this April 13th email, UTI's counsel reiterated that UTI was still interested in reaching an amicable pre-litigation settlement.  *See id*.

70.     UTI had been waiting, in good faith, for the documents that had been promised by Mr. Hawkins on behalf of his clients to aid the parties in settlement negotiations.

71.     At no point did Mr. Hawkins or Defendants warn that they would be filing an action against UTI, and such conduct would be contrary to the agreement of counsel, and express promises of Mr. Hawkins on behalf of his clients.

72.     However, on April 24, 2017, UTI discovered that an action had been initiated by Defendants, through Mr. Hawkins, against UTI in the Superior Court of Fulton County, Georgia, and that Defendants had filed a Motion for Temporary Restraining Order and Injunctive Relief. *See* Verified Complaint for Declaratory and Injunctive Relief and Damages, without accompanying exhibits, attached hereto as Exhibit "I".

73.     In this action, which was commenced on April 18, 2017 without warning or notice to UTI or its counsel, Defendants allege that Sections 6 and 7 of the Employment Agreement are not enforceable under Georgia law and that Georgia law is applicable.  *See id*., at ¶¶ 45-51.

74.     Defendants engaged in deceptive forum shopping and filed this action in Georgia because of their purported belief that Georgia law is more favorable to them.

75.     In summary, Defendants undertook the following actions after being warned about imminent litigation:  (a)  Defendants requested through counsel that an action against them, which they knew would be commenced in Pennsylvania, be put-off while the parties engaged in settlement discussions; (b) Defendants promised informal discovery and induced UTI to engage in a wild-goose chase in preparing discovery requests; and (c) While UTI patiently waited to receive such promised discovery, Defendants deceptively and secretly rushed to the courthouse in Fulton County, Georgia to file an action in their preferred forum.

**Defendants' Unlawful Actions Initiated In Pennsylvania, Targeted UTI In Pennsylvania, And Effected UTI In Pennsylvania**

76.     Leighton's employment with UTI required him to routinely work out of UTI's office in Chester Springs, Pennsylvania; and during his employment, Leighton resided at 285 Green Hollow Road, Glenmoore, Pennsylvania 19343, in a home that he still owns and occupies with his wife.

77.     At all times relevant hereto, UTI's Trade Secrets were developed, created and protected in Pennsylvania.

78.     While Defendants' tortious acts have continued in Georgia, their tortious conduct and misappropriation of UTI's Trade Secrets initiated in Pennsylvania and has at all times been expressly aimed at targeting UTI in Pennsylvania, and specifically within this judicial district, where UTI has felt the brunt of the harm of Defendants' tortious acts.

79.     Leighton advertised and promoted DTS and Secure Vizual while still employed by UTI in Pennsylvania, and Leighton breached his Employment Agreement through actions that occurred in Pennsylvania.

14

80.     Upon information and belief, Defendants continue to regularly transact business in Pennsylvania and Leighton continues to accept and receive business mail at his home in Pennsylvania.

81.     At all times relevant hereto, DTS and Secure Vizual were controlled and directed by Leighton, who owns 100% of both companies.

82.     DTS and Secure Vizual are believed to be grossly undercapitalized and effectively sham corporations that were started as a façade for the operations of Leighton who was transacting business on behalf of DTS and Secure Vizual in Pennsylvania before these entities were incorporated in Georgia.

83.     For the foregoing reasons, the corporate veil of DTS and Secure Vizual should be pierced, and Leighton should be held personally liable due to the doctrines of agency and alter-ego to prevent injustice.

**As A Direct And Proximate Result of Defendants' Unlawful Actions, UTI Has Suffered, And Will Continue To Suffer, Substantial Economic Damages And Substantial And Irreparable Harm For Which UTI Has No Adequate Remedy At Law**

84.     Through the above-referenced conduct, Leighton has breached the Employment Agreement with UTI and his fiduciary duty to UTI, and Defendants have intentionally interfered with UTI's contractual relationships with its customers and employees, and misappropriated UTI's Trade Secrets.

85.     The harm committed by each and every Defendant has caused economic damages to UTI that exceed $150,000.

86.     As just one example, the loss of THD's business that was caused by Defendants' unlawful actions has *already* accounted for hundreds of thousands of dollars in damages to UTI.

87.     In addition to economic harm, Defendants' misappropriation of UTI's Trade Secrets and other unlawful conduct has harmed UTI's relationship with its customers and employees, and its business reputation.

88.     Defendants' unlawful conduct has caused, and will continue to cause, irreparable harm to UTI, for which UTI has no adequate remedy at law.

89.     At all times relevant hereto, DTS and Secure Vizual were acting by and through their agents and/or employees who were acting within the course and scope of their agency or employment.

90.     At all times relevant hereto, the conduct of Defendants was intentional, willful, wanton, outrageous and reckless.

## COUNT I
## BREACH OF CONTRACT
### (UTI v. Leighton)

91.     UTI incorporates by reference each and every allegation set forth above as if fully set forth herein.

92.     The Employment Agreement between UTI and Leighton is a valid and enforceable agreement and supported by adequate consideration.

93.     The Employment Agreement prohibits Leighton from, *inter alia*, directly or indirectly soliciting UTI's customers or employees, and disclosing or using UTI's confidential, proprietary, and trade secret information.  *See* Employment Agreement, ¶¶ 6, 7.

94.     The conduct and actions of Leighton as alleged herein constitute a breach of the Employment Agreement, particularly Paragraphs 6 and 7 of the Employment Agreement.

95.     Leighton has deliberately breached the Employment Agreement by, *inter alia*, misappropriating and using UTI's Trade Secrets, soliciting UTI's clients and employees, and hiring a UTI employee.

96.     Upon information and belief, Leighton has used UTI's Trade Secrets and inevitably will use and/or disclose UTI's Trade Secrets in the course of his unlawful competition with UTI in violation of the Employment Agreement.

97.     As a direct and proximate result of Leighton's actual and/or prospective breaches of the Employment Agreement, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

98.     As a direct and proximate result of Leighton's actual and/or prospective breaches of the Employment Agreement, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

a.     Enforcement of the Employment Agreement;

b.     Injunctive Relief prohibiting Leighton from violating the terms of the Employment Agreement;

c.     Compensatory damages;

d.     Damages or disgorgement in the amount that Leighton has been unjustly enriched as a result of his breaches of the Employment Agreement;

e.     An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Leighton's breaches of the Employment

Agreement or from his possession of UTI's property, including UTI's

Trade Secrets;

f.     An equitable accounting, forfeiture, forensic analysis, and return of all

UTI's information and property in Leighton's possession, custody or

control, including UTI's Trade Secrets;

g.     The establishment of a constructive trust in favor of UTI;

h.     UTI's attorneys' fees and costs;

i.     Interest; and

j.     All such other relief as this Court deems appropriate.

## COUNT II
## BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY
### (UTI v. Leighton)

99.     UTI incorporates by reference each and every allegation set forth above as if fully

set forth herein.

100.    During the term of his employment with UTI, Leighton was an agent of UTI who

undertook important responsibilities, authority and trust as its Vice President of Sales, and the

person in charge of overseeing the entire sales and marketing department.

101.    During the term of his employment with UTI, Leighton owed UTI a duty of the

utmost good faith, undivided loyalty, diligence, and faithful service, and a duty to place UTI's

interests ahead of his own and not to act for persons, entities, or purposes whose interests would

conflict with those of UTI.

102.    Disregarding those duties while being highly compensated by UTI, Leighton

diverted his efforts during his time as a UTI employee towards the solicitation of UTI's

customers and employees, and on behalf of Leighton's own personal business interests, as well as those of DTS and Secure Vizual, and in competition with UTI.

103.    Leighton breached his fiduciary duty by exploiting and misusing UTI's time, information, resources, including UTI's Trade Secrets, in order to benefit Defendants.

104.    Leighton breached his fiduciary duty by usurping customer relationships that belonged to UTI to benefit Defendants and compete against UTI.

105.    Leighton breached his fiduciary duty by exploiting his access to UTI's Trade Secrets and misappropriating such information to benefit Defendants and compete against UTI.

106.    Leighton breached his fiduciary duty by sabotaging UTI's efforts to promote UTI's Dashboard Product while he simultaneously competed against UTI through his efforts to promote the SV product.

107.    Leighton breached his fiduciary duty by soliciting UTI employees to resign from UTI and to join him and unlawfully compete against UTI.

108.    Leighton was bound to act in good faith and with due regard to the interest of UTI while employed by UTI, but instead acted for his own interest and to injure UTI in its business, and Leighton has been unjustly enriched through his unlawful conduct.

109    As a direct and proximate result of Leighton's tortious conduct, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

110.    As a direct and proximate result of Leighton's tortious conduct, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

        a.    Compensatory damages;

     b.     Damages or disgorgement in the amount that Leighton has been unjustly enriched as a result of the breaches of his fiduciary duties to UTI;

     c.     Recoupment of compensation paid to Leighton during the breach of his fiduciary duties to UTI;

     d.     An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Leighton's tortious conduct;

     e.     An equitable accounting, forfeiture, forensic analysis, and return of all UTI's information and property in Leighton's possession, custody or control, including UTI's Trade Secrets;

     f.     Injunctive relief;

     g.     The establishment of a constructive trust in favor of UTI;

     h.     UTI's attorneys' fees and costs;

     i.     Interest; and

     j.     All such other relief as this Court deems appropriate.

<u>COUNT III</u>
<u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AND PROSPECTIVE BUSINESS RELATIONSHIPS</u>
**(UTI v. All Defendants)**

111.    UTI incorporates by reference each and every allegation set forth above as if fully set forth herein.

112.    As alleged herein, Defendants have tortiously interfered with UTI's contractual relationships with its customers and employees.

113.    At all times relevant hereto, Defendants were aware that UTI had existing contractual relationships with its customers, which included but were not limited to THD, as well

its employees, which included but were not limited to Charlie Von Stetten, Lucia Capriotti, and Sean Moody.

114.    Defendants have tortiously interfered with UTI's contractual relationships with THD, and the above-named employees, by encouraging and/or causing them to breach and/or cease their contractual relationships with UTI.

115.    Defendants have tortiously interfered with UTI's contractual relationships with its current customers and its prospective customers through its misappropriation of UTI's Trade Secrets.

116.    Throughout all of their tortious conduct, Defendants have acted without privilege or justification in interfering with UTI's relationships with its customers and employees.

117.    Defendants' tortious interference was willful and wanton and has been carried out with the specific intent to injure UTI in the conduct of its business.

118.    As a direct and proximate result of Defendants' tortious conduct, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

119.    As a direct and proximate result of Defendants' tortious conduct, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

    a.    Compensatory damages;

    b.    Punitive damages;

    c.    Damages or disgorgement in the amount that Defendants have been unjustly enriched as a result of their tortious conduct;

d. An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants' tortious conduct;

e. An equitable accounting, forfeiture, forensic analysis, and return of all UTI's information and property in Defendants' possession, custody or control, including UTI's Trade Secrets;

f. Injunctive relief;

g. The establishment of a constructive trust in favor of UTI;

h. UTI's attorneys' fees and costs;

i. Interest; and

j. All such other relief as this Court deems appropriate.

## COUNT IV
## UNFAIR COMPETITION (Pennsylvania Common Law)
### (UTI v. All Defendants)

120. UTI incorporates by reference each and every allegation set forth above as if fully set forth herein.

121. Through their wrongful acts, Defendants, in bad faith, knowingly misappropriated UTI's confidential and proprietary information, including UTI's Trade Secrets, for their own business interests and to compete against UTI.

122. Defendants wrongfully used, for their own unfair commercial advantage, proprietary information that UTI had developed through considerable expenditure of resources and effort.

123. Defendants unfairly competed against UTI through their tortious interference with UTI's contractual relationships with its customers and employees, as stated herein.

124.    As a direct and proximate result of Defendants' unfair competition, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

125.    As a direct and proximate result of Defendants' unfair competition, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

       a.      Compensatory damages;

       b.      Punitive damages;

       c.      Damages or disgorgement in the amount that Defendants have been unjustly enriched as a result of their unfair competition;

       d.      An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants' unfair competition;

       e.      An equitable accounting, forfeiture, forensic analysis, and return of all UTI's information and property in Defendants' possession, custody or control, including UTI's Trade Secrets;

       f.      Injunctive relief;

       g.      The establishment of a constructive trust in favor of UTI;

       h.      UTI's attorneys' fees and costs;

       i.      Interest; and

       j.      All such other relief as this Court deems appropriate.

**COUNT V**
**MISAPPROPRIATION OF TRADE SECRETS**
**(UTI v. All Defendants)**

126.    UTI incorporates by reference each and every allegation set forth above as if fully set forth herein.

127.    UTI has protectable confidential information in UTI's Trade Secrets.

128.    UTI derives economic value from UTI's Trade Secrets, due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

129.    UTI has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

130.    Defendants have improperly acquired and have improperly used (and continue to improperly use) UTI's Trade Secrets to compete with UTI and to injure UTI and its relationships with its customers and prospective customers.

131.    The improper acquisition, disclosure and use of such information constitutes a misappropriation of trade secrets in violation of common law and 12 Pa. C.S.A. § 5302 (Pennsylvania's Uniform Trade Secret Act).

132.    As a direct and proximate result of Defendants' misappropriation of trade secrets, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

133.    As a direct and proximate result of Defendants' misappropriation of trade secrets, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

a.    Compensatory damages as set forth under the statute;

b.    Exemplary damages due to the willfulness and maliciousness of Defendants' misappropriation;

c.    Damages or disgorgement in the amount that Defendants have been unjustly enriched as a result of their misappropriation;

d.    An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants' misappropriation;

e.    An equitable accounting, forfeiture, forensic analysis, and return of all UTI's misappropriated trade secrets in Defendants' possession, custody or control;

f.    Injunctive relief;

g.    The establishment of a constructive trust in favor of UTI;

h.    UTI's attorneys' fees and costs;

i.    Interest; and

j.    All such other relief as this Court deems appropriate.

## COUNT VI
## VIOLATIONS OF THE DEFEND TRADE SECRETS ACT OF 2016
### (UTI v. All Defendants)

134.    UTI incorporates by reference each and every allegation set forth above as if fully set forth herein.

135.    UTI has protectable confidential information in UTI's Trade Secrets.

136.    UTI derives economic value from UTI's Trade Secrets, due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

137.    UTI has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

138.    Defendants have improperly acquired and have improperly used (and continue to improperly use) UTI's Trade Secrets to compete with UTI and to injure UTI and its relationships with its customers.

139.    The improper acquisition, disclosure and use of such information constitutes a misappropriation of trade secrets in violation of the Defend Trade Secrets Act, (DTSA), 18 U.S.C. § 1836, *et seq*.

140.    As a direct and proximate result of Defendants' violations of the DTSA, UTI has suffered, and will continue to suffer, substantial and irreparable damage.

141.    As a direct and proximate result of Defendants' violations of the DTSA, UTI has suffered, and will continue to suffer, substantial economic damages.

WHEREFORE, UTI demands judgment in its favor and against Leighton, and respectfully requests the following relief:

a.      Compensatory damages as set forth under the statute;

b.      Exemplary damages due to the willfulness and maliciousness of Defendants' misappropriation;

c.      Damages or disgorgement in the amount that Defendants have been unjustly enriched as a result of their violations of the DTSA;

d.      An equitable accounting, disgorgement, forfeiture, and delivery to UTI of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants' violations of the DTSA;

e. An equitable accounting, forfeiture, forensic analysis, and return of all UTI's misappropriated trade secrets in Defendants' possession, custody or control;

f. Injunctive relief;

g. The establishment of a constructive trust in favor of UTI;

h. UTI's attorneys' fees and costs;

i. Interest; and

j. All such other relief as this Court deems appropriate

## JURY DEMAND

Plaintiff demands a trial by jury on all counts of its Complaint that are triable.

Respectfully submitted,

Dated: April 26, 2017

Casey Green, Esquire
Sidkoff, Pincus & Green, P.C.
1101 Market Street
2700 Aramark Tower
Philadelphia, PA 19107
215-574-0600 (phone)
215-574-0310 (fax)
cg@sidkoffpincusgreen.com

Attorney for Plaintiff,
Unlimited Technology, Inc.